UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION
CASE NO. 4:04CV-134-R

JACK C. BLACKSTONE, JR.                                                                    PLAINTIFF

v.

MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY                    DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on Defendant's Motion for Summary Judgment (Docket #36). Plaintiff has filed a response (Docket #41), to which Defendant has replied (Docket #43). Plaintiff has also filed a Motion for Partial Summary Judgment (Docket #33). Defendant has filed a response (Docket #38), to which Plaintiff has replied (Docket #42). These matters are now ripe for adjudication. For the reasons that follow, Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and Plaintiff's Motion for Partial Summary Judgment is DENIED.

**BACKGROUND**

**I.      PLAINTIFF'S DISABILITY**

From 1977 to 2000, Plaintiff practiced as an obstetrician and gynecologist in Owensboro, Kentucky. He is board certified by the American College of Obstetricians and Gynecologists and by the American College of Surgeons.[1] In 2000, he was a twenty-five percent partner in The Women's Pavillion, with his practice consisting of the provision of obstetric care, gynecological

---

[1] There is a single certification for obstetrics and gynecology from the Board of Obstetrics and Gynecology.

care, and office care. Plaintiff had full privileges in obstetrics and gynecology at the Owensboro Mercy Health System, and provided gynecological care at the Perry County Memorial Hospital in Indiana. According to Plaintiff's accountant, obstetrics annually accounted for thirty-six percent of Plaintiff's earnings for the years 1997-2000.

During 2000, Plaintiff was diagnosed with hearing loss due to an acoustic neuroma of the 8th cranial nerve. Plaintiff decided to have this benign tumor removed. The surgery caused a complete loss of hearing in Plaintiff's left ear, which had been anticipated. A day or so following the surgery, Plaintiff also developed paralysis of the facial nerve. This paralysis involved the inability to control the muscles of the left side of his face.[2] Initially, Plaintiff's prognosis included a ninety to ninety-five percent chance that the paralysis would resolve itself. As of December 2004, Plaintiff had only experienced a very slight improvement in the paralysis.[3]

Following the surgery, Plaintiff was unable to blink his left eye, posing a risk of damage to the eye. A second surgery was performed in which a gold weight was inserted in Plaintiff's left upper eyelid and Plaintiff's left eye tear duct was sealed. This was done to help protect Plaintiff's eye from becoming too dry and permanently damaging his cornea.

Plaintiff suffers from a loss of sensation to the lateral portion of the cornea of his left eye. By the time he feels discomfort in his left eye, it is too dry. Plaintiff is unable to get the eye back to normal moisture function for the rest of the day. Plaintiff's left eye requires constant attention to keep it from getting too dry. Plaintiff must spend eight to ten hours sleeping each night to

---

[2] Plaintiff also has difficulty swallowing on the left side.

[3] Following his surgery, Plaintiff had plastic surgery in Florida to correct the disfigurement to the left side of his face due to the paralysis.

rehydrate his eye.

Plaintiff returned to his practice in June of 2000. To allow his eye to rehydrate at night, Plaintiff decided to stop delivering babies, however he continued to perform surgeries and see patients in his office. Plaintiff only performs surgeries in the early morning hours while his left eye is moist and he has depth perception. Until approximately eleven in the morning he can use thin eyedrops in his eye, after that point he must use thicker eyedrops, which prevent him from seeing out of his left eye, to ease the dryness and the pain.

Plaintiff indicates that due to the complications from the surgery he has had to hire another assistant to help him in the office. He also indicates that he has changed his record keeping system to reduce the amount of reading and writing. Plaintiff continues to see patients in the office although he has also decreased the number of patients that he sees during the day. Plaintiff also has reduced his involvement in medical staff matters because he cannot attend evening meetings.

In March of 2005, Plaintiff reduced the number of his workdays to between three-and-a-half to four, with surgery early in the morning on two, sometimes three, of those days. At lunchtime, Plaintiff would sit and rest. Plaintiff typically did not work past four in the afternoon.

## II.    INSURANCE POLICIES

Plaintiff is an insured on four policies of insurance issued by Defendant. Three of the policies contain riders known as Regular Occupation Riders ("ROR"). Each ROR policy defines Regular Occupation and provides explanations of how disability income benefits are determined.

### A.    Policy No. 9 909 673

The first policy of disability insurance Defendant issued Plaintiff has a policy date of September 1, 1977, and provides for a monthly income benefit of $2500 following a thirty day

waiting period. It has no ROR, thus no claim for total disability under a ROR is being made under this policy. There is no dispute pertinent to this litigation under this policy.

**B.     Policy No. 9 322 047**

The second policy was issued to Plaintiff on April 7, 1988, and provides a $6500 base per month indemnity and an additional $1000 per month Contingent Monthly Income Rider benefit. The amount of benefit is stated in the policy to be a percentage of the income lost by the insured due to disability. This policy also includes a ROR, which provides an alternate method of determining Plaintiff's Loss of Earned Income while he is disabled. Under the ROR, "for each month of disability, [Defendant] determine[s] the amount of the monthly average the Insured is prevented from earning in the Insured's Regular Occupation because of that disability."

> In determining Loss of Earned Income under the Standard Method, [Defendant] consider[s] the ability of the Insured to earn income from all occupations during disability. Under the Alternate Method [that of the ROR], [Defendant] consider[s] the ability of the Insured to earn income from only the Regular Occupation during disability.

Regular Occupation is defined in the ROR as "any work, employment, business, or profession which produced at least 25% of the Insured's Earned Income in any of the three successive twelve-month periods immediately preceding disability." The following example is provided:

> For the three successive twelve-month periods immediately preceding disability, your Earned Income was produced only from employment as a lawyer and a salesman. Sales activities produced 30%, 14%, and 0% of your Earned Income for those three periods. Your Regular Occupation, therefore, is both lawyer and salesman. If, instead, sales activities had produced 18%, 14% and 0% of your Earned Income for those three periods, your Regular Occupation would be lawyer only.

The ROR indicates that the Alternate Method is to be used only if:

4

- The Loss of Earned Income for that month, as determined by the Standard Method, is not more than 75%; and

- The Loss of Earned Income for that month, as determined by the Alternate Method, is more than 75%; and

- The Insured's Earned Income from all occupations for that month is not more than 200% of the monthly average.

If these conditions are met, the Loss of Earned Income is considered to be 100%.

## C.    Policy No. 9 435 614

The third policy was issued to Plaintiff in June 1991 and provides for a maximum monthly benefit of $4660 after a ninety day waiting period. The policy also has a ROR, although the ROR form had been revised after issuance of the earlier policy.

The ROR contained in this policy indicates that the insured is considered to have a 100% Loss of Earned Income for each month he is "unable to perform the substantial and material duties of the Regular Occupation because of disability."

However, this provision does not apply:

- For any month of disability beyond the Maximum Benefit Period for this rider, as shown on the Schedule Page; or

- To satisfy the over-75% Loss of Earned Income requirement under any extended monthly income benefit.

An insured is considered to have a fifty percent Loss of Earned Income for each month of disability for which the following conditions are met:

- Because of that disability, the Insured is unable to perform one or more of the substantial and material duties of the Regular Occupation; and

- Those substantial and material duties which the Insured is unable to perform accounted for at least 20% of the time spent at the Regular Occupation just before the date disability began.

However, this provision does not apply:

- For more than 6 months of income payments. However, this number of months will be reduced by the number of months of income payments made under the Minimum 50% Loss of Earned Income provision in Part 1 of the policy. These 6 months, or any reduced number thereof, need not be consecutive; or

- For any month of disability beyond the Maximum Benefit Period for this rider, as shown on the Schedule Page; or

- For any month of disability for which the Loss of Earned Income specified in the policy without this rider is greater than 50%; or

- For any month of disability for which the Presumed 100% Loss of Earned Income provision applies.

This policy's definition of Regular Occupation states:

Regular Occupations means the occupations in which the Insured was regularly engaged just before the date disability began.

Example: Just before the date disability began, you were regularly employed as a lawyer and as an accountant. Your Regular Occupation, therefore, is both lawyer and accountant.

### D.     Policy No. 9 495 578

The fourth policy was issued to Plaintiff in June 1993 and provides for a maximum monthly benefit of $4660. This policy contains a ROR identical to that contained as part of Policy No. 9 435 614. The provision relating to measuring the insured's Loss of Income is also identical to the provision contained in Policy No. 9 435 614.

### III.    PLAINTIFF'S CLAIM FOR BENEFITS

Plaintiff submitted his claim for benefits under the RORs on November 24, 2003. According to that submission, Plaintiff continued after the onset of his disability to perform gynecological surgery and see patients in the office but could no longer provide obstetrical care.

6

Defendant denied Plaintiff total disability income benefits and awarded him partial disability benefits. Defendant states that this determination was based on its finding that Plaintiff continued to work in the same occupation as he had prior to his disability and thus did not qualify for benefits under the alternate method set forth in the ROR contained in three of the policies. Defendant determined instead that Plaintiff was entitled to benefits based on the loss of income that he had suffered because of his disability.

Plaintiff states that he is entitled to total disability income benefits on the following basis:

1. His practice of obstetrics generated more than 25% of his Earned Income pre-disability.

2. As a result of his disability, he is no longer able to practice obstetrics.

3. His monthly Loss of Earned Income from all occupations does not exceed 200% of the monthly average, and is, in fact, lower than his pre-disability Earned Income.

Plaintiff argues that since he previously practiced both obstetrics and gynecology, each of which constituted more than twenty-five percent of his Earned Income, and is no longer able to practice obstetrics, he is entitled to total disability income benefits under the ROR to Policy No. 9 322 047. Plaintiff argues that since he is no longer able to perform the substantial and material duties of obstetrics due to his disability, he is entitled to total disability benefits under the ROR's to Policy No. 9 435 614 and Policy No. 9 495 578.

Plaintiff filed a complaint seeking declaratory relief in the Daviess Circuit Court on September 24, 2004, asking the court to determine the rights and obligations of the parties under the terms of the disability income policies with RORs. The action was subsequently removed to this Court on October 18, 2004.

**STANDARD**

Summary judgment is available under Fed. R. Civ. P. 56(c) if the moving party can establish that the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

"[N]ot every issue of fact or conflicting inference presents a genuine issue of material fact." *Street v. J. C. Bradford & Co.*, 886 F.2d 1472, 1477 (6th Cir. 1989). The test is whether the party bearing the burden of proof has presented a jury question as to each element in the case. *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996). The plaintiff must present more than a mere scintilla of evidence in support of his position; the plaintiff must present evidence on which the trier of fact could reasonably find for the plaintiff. *See id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). Mere speculation will not suffice to defeat a motion for summary judgment: "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Moinette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996). Finally, while Kentucky state law is applicable to this case pursuant to *Erie Railroad v. Tompkins*, 304 U.S. 64 (1938), a federal court in a diversity action applies the standards of Fed. R. Civ. P. 56, not "Kentucky's summary judgment standard as expressed in *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476 (Ky. 1991)." *Gafford v. Gen. Elec. Co.*, 997 F.2d 150, 165 (6th Cir. 1993).

## DISCUSSION

The Kentucky Supreme Court has summarized many of the canons to be used in the interpretation of insurance contracts within the commonwealth:

> [A]s to the manner of construction of insurance policies, Kentucky law is crystal clear that exclusions are to be narrowly interpreted and all questions resolved in favor of the insured. Exceptions and exclusions are to be strictly construed so as to render the insurance effective. Any doubt as to the coverage or terms of a policy should be resolved in favor of the insured. And since the policy is drafted in all details by the insurance company, it must be held strictly accountable for the language used.

*Eyler v. Nationwide Mut. Fire Ins. Co.*, 824 S.W.2d 855, 859-60 (Ky. 1992) (citations omitted). However, these canons are only applicable "when the language of the insurance contract is ambiguous or self-contradictory. Otherwise, the contract is to be read according to its plain meaning, its true character and purpose, and the intent of the policies." *Peoples Bank & Trust Co. v. Aetna Cas. & Sur. Co.*, 113 F.3d 629, 636 (6th Cir. 1997).

## I.      POLICY NO. 9 322 047

The ROR to Policy No. 9 322 047 indicates that Loss of Earned Income under the Standard Method is determined by considering the ability of the Insured to earn income from all occupations during disability. Under the Alternate Method, provided by the ROR, "the ability of the Insured to earn income from only the Regular Occupation during disability" is considered. Whereas the Standard Method considers ability to earn under all occupations, the ROR policy only references the ability of an Insured to earn income under a singular Regular Occupation. There is no indication that there could be more than one Regular Occupation.

The singular is also used in the provided example of Regular Occupation. The Example states: "For the three successive twelve-month periods immediately preceding disability, your Earned Income was produced only from employment as a lawyer and a salesman. Sales activities

9

produced 30%, 14% and 0% of your Earned Income for those three periods. Your Regular Occupation, therefore, is both lawyer and salesman." According to this example, the Insured would not have a Regular Occupation of lawyer and a Regular Occupation as a salesman, resulting in two Regular Occupations; rather according to the example, the singular Regular Occupation would be that of both a lawyer and a salesman. *See Goebel v. Goebel*, 258 S.W. 691, 693 (Ky. 1924) ("both husband and wife" does not mean "either husband or wife"). A plain reading of the ROR to this policy indicates that the Insured may only have a single Regular Occupation. *See Peoples Bank*, 113 F.3d at 636.

The Alternate Method of determining Loss of Earned Income under the ROR to this policy states: "For each month of disability, we determine the amount of the monthly average the Insured is prevented from earning in the Insured's Regular Occupation because of that disability." As the ROR to this policy allows for only a single Regular Occupation, it makes no difference to Plaintiff whether obstetrics and gynecology constitute two separate practice areas or only a single practice area.[4] The monthly average Plaintiff is prevented from earning in his Regular Occupation because of his inability to practice obstetrics will be the same regardless of the classification, as Plaintiff's Regular Occupation is either the practice of both obstetrics and gynecology or the practice of obstetrics/gynecology. Thus, under either classification, the Loss of Earned Income must take into account Plaintiff's earnings from both obstetrics and gynecology.

To qualify for total disability payments under the alternate method provided by the ROR

---

[4] Obstetrics annually accounted for thirty-six percent of Plaintiff's earnings for the years 1997-2000, thus even if obstetrics is a practice area separate from gynecology, both obstetrics and gynecology would be Plaintiff's Regular Occupation under the ROR to Policy No. 9 322 047.

10

three conditions must be met: (1) the Loss of Earned Income for that month as determined by the Standard Method must be not more than seventy-five percent; (2) the Loss of Earned Income for that month, as determined by the alternate method provided by the ROR must be more than seventy-five percent; and (3) the Insured's Earned Income from all occupations for that month must be no more than 200 percent of the monthly average. There is no dispute that at this time Plaintiff's Loss of Earned Income as determined by the Standard Method is less than seventy-five percent and that Plaintiff's Earned Income from all occupations is less than 200 percent of the monthly average. As Plaintiff's Regular Occupation includes both the practice of obstetrics and gynecology, there is also no dispute that at this time Plaintiff's Loss of Earned Income as determined by the alternate method provided by the ROR is less than seventy-five percent. Therefore, Plaintiff is not entitled to total disability benefits under the ROR to Policy No. 9 322 047 until such time as the Loss of Earned Income from his practice of both obstetrics and gynecology falls below seventy-five percent.

## II.     POLICY NO. 9 435 614 AND POLICY NO. 9 495 578

The ROR to Policy No. 9 435 614 reads the same as that to Policy No. 9 495 578; therefore, the analysis will be the same under both policies. An ambiguity exists as to whether an Insured can have more than one Regular Occupation under this ROR. The definition of Regular Occupation utilizes the plural stating, "Regular Occupations means the occupations in which the Insured was regularly engaged just before the date disability began." However, the example given is similar to that provided in the ROR to Policy No. 9 322 047: "Just before the date disability began, you were regularly employed as a lawyer and as an accountant. Your Regular Occupation, therefore, is both lawyer and accountant." The use of the plural "Regular Occupations" indicates that the Insured may have more than one Regular Occupation whereas the example utilizes the singular "Regular

11

Occupation" to apply to two professions. As any doubt as to the coverage or terms of the policy must be resolved in favor of the insured, this Court finds that under the RORs to these two policies, an Insured can have more than one Regular Occupation. *See Eyler*, 824 S.W.2d at 859.

This Court must now determine whether Plaintiff's practice in obstetrics and gynecology constituted a single practice or two separate and distinct practices. Obstetrics is defined as "a branch of medical science that deals with birth and with its antecedents and sequels." Merriam-Webster On-Line, *available at* http://www.m-w.com/dictionary/obstetrics (January 22, 2007). Gynecology is defined as "a branch of medicine that deals with the diseases and routine physical care of the reproductive system of women." Merriam-Webster On-Line, *available at* http://www.m-w.com/dictionary/gynecology (January 22, 2007). Plaintiff provided evidence that Owensboro Medical Health System has separate call schedules for obstetrics and gynecology, the patients for gynecology and obstetrics are scheduled though a separate system, patients are operated on in a separate department and their post-operative care is in a separate department, they have separate nursing staff, the education for the nursing staff is separate, patients are triaged separately when they come into the emergency room, and the two departments are located in different parts of the hospital. The hospital also has separate privileging procedures for physicians in obstetrics and for physicians in gynecology; there are currently several physicians at Owensboro Medical Health System who, in addition to Plaintiff, are privileged in either gynecology or obstetrics, but not both.[5] This Court now concludes that prior to his disability, Plaintiff was engaged in two separate Regular Occupations, the practice of obstetrics and the practice of gynecology. *See Weum v. Mut. Benefit*

---

[5] Plaintiff currently only has privileges in gynecology at Owensboro Medical Health System.

*Health & Accident Ass'n*, 54 N.W.2d 20, 22, 25 (Minn. 1952) (recognizing the separate and distinct practices of obstetrics and gynecology).

The ROR to these policies indicates that an Insured is considered "to have a 100% Loss of Earned Income for each month the Insured is unable to perform the substantial and material duties of the Regular Occupation because of disability." The ROR provides for total disability benefits when the Insured is unable to perform the substantial and material duties of a singular Regular Occupation; thus the ROR does not require the Insured to be unable to perform the substantial and material duties of all of the Regular Occupations in order to qualify for total disability benefits. Defendant argues that Plaintiff was required to engage in an entirely different occupation in order to receive total disability benefits. However, the cases Defendant cites to support this proposition all deal with contracts where Regular Occupation was not defined, was used only in the singular indicating that there could be only one Regular Occupation, or was defined to specifically include all occupations that the Insured was practicing prior to disability. *Hamaker v. Paul Revere Life Ins. Co.*, No. IP02–632-C-M/S, 2004 WL 963701 (S.D. Ind. Apr. 2, 2004); *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 217 (Tex. 2003); *Giustra v. Unum Life Ins. Co.*, 815 A.2d 811, 813 (Me. 2003); *Falik v. Penn Mut. Life Ins. Co.*, 204 F. Supp. 2d 1155, 1156 (E.D. Wis. 2002); *Yahiro v. Northwestern Mut. Life Ins. Co.*, 168 F. Supp. 2d 511, 513-14 (D. Md. 2001); *Dym v. Provident Life & Accident Ins. Co.*, 19 F. Supp. 2d 1147, 1148 (S.D. Cal. 1998); *Klein v. Nat'l Life*, 7 F. Supp. 2d 223, 224 (E.D.N.Y. 1998); *Rahman v. Paul Revere Life Ins. Co.*, 684 F. Supp. 192, 195 (N.D. Ill. 1988). As the contract at issue specifically used the term "Regular Occupations," this Court finds these cases unpersuasive.

Defendant disputes whether Plaintiff is no longer able to perform the substantial and material

duties of an obstetrician, one of his Regular Occupations prior to his claimed disability.  Defendant argues that Plaintiff "changed his work routine not due to any actual physical inability to deliver babies, but by a desire not to work at night in order to hydrate his eye."  Plaintiff states that his disability prevents him from practicing obstetrics as he must spend eight to ten hours sleeping each night in order to rehydrate his eye.  Therefore, this Court finds that there is a question of material fact as to whether Plaintiff is entitled to total disability benefits under the RORs to Policy No. 9 435 614 and Policy No. 9 495 578, which precludes the grant of summary judgment.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART and the Plaintiff's Motion for Partial Summary Judgment is DENIED.

An appropriate order shall issue.